If an agent were to appear before a magistrate and say, I'm going to tell you seven things, but three of them are false, and I might exaggerate a little, the magistrate would not sign the warrant. And that is the position that the agents put the magistrate in here. Is that right? I mean, it's hard to imagine. Might the magistrate look and see, if I put to one side the things you're going to tell me that are false and the things that are an exaggeration, what's left? Well, not every fact before the magistrate weighs the same. And in this particular case, the areas where the false statements and the misrepresentations and the exaggerations were the most important aspects of probable cause. Particularly in light of the fact that they related to the undercover operation and the main background confidential source, who was divided into two instead of one, who was under investigation for making false claims against the United States. And also for the employee of the clinic who was represented to have said that the MRIs were outright false, when really that individual had said to the agents that there was something strange. Why do we have to wrangle with that in the first place? Where's your standing? The standing here is derived from multiple different sources. First of all, there's the fact that there's a source outside of property rights that provides standing here. It is federal law. And what is that authority? That is HIPAA, and it is also the American Medical Association ethics guidelines, which state that the confidentiality between a doctor and a patient lasts even until after death. This court in a case in 2000, Doe versus Broderick, was examining patient records from a methadone clinic. And in that case, this court said essentially medical records are a little bit different. There was a federal statute providing an additional bit of privacy protection for drug treatment records. This is an analogous situation. There's also an additional source of the privacy. Can I just stop you on that? I thought in Doe it sounded like the privacy right kind of went with the patient, not with the doctor. So Doe is not exactly on point. Doe does not answer the question here. But Doe is instructive in where the court looked for the source of that privacy right. And that source was federal law. But is there a federal law that gives doctors privacy rights in medical records? Well, the doctors have privacy obligations, and the patient's privacy rights are meaningless without that corresponding right. So it was the idea that the doctor would be able to, would have standing on behalf of the patients? They certainly would have standing on behalf of the patients. There's another situation that also provides standing for Dr. Crittenden, and that is the fact that even after a physician leaves a medical practice, they are still essentially on the hook for medical malpractice lawsuits based on information in those patient files and those patient files themselves. We actually know from the record in this case that that happened here. It's ECF 192. It's not in the joint appendix because that document is a motion in lemonade about issues at trial that had nothing to do with the Fourth Amendment issue. I thought under his contractual arrangement with us, he expressly disclaimed any possessory interest in the patient's file. Possessory interest would certainly be one factor to consider in standing, but it is not the only one. If he possessed the interest, it would be an easy case and clear, but standing is a preliminary issue. It is not something that must be all or nothing, and there's the sliding scale, the totality of the circumstances. So you think access to the documents is sufficient for standing here? That's what you're saying. He has a right to access, protect his professional judgment if it's called in question in a lawsuit for medical malpractice? Correct, and the ability to control who else has access to the documents as well. What standing really requires is a societal recognition of the privacy right. It doesn't have to have possession. It doesn't have to have a real property interest. There's no single item that must be checked off the list. We need a societal recognition, and we have that with the doctor's interest in patient files. For example, I guess you would say that if a third party was trying to get his documents, he would have a right to at least move to court to quash a subpoena. Absolutely he would. I definitely grant you that this particular situation has probably not been examined by this court before, but that does not mean that society doesn't recognize this privacy interest. Rakes v. Illinois is just an old-fashioned cat's privacy analysis of, is there a subjective privacy interest and does society recognize it? Here we have met that preliminary threshold. What about the fact that this is a commercial premises? Doesn't that lessen your privacy interest? Judge Floyd, it's another factor to consider, but a medical clinic is not just any old commercial premises. This is not the sort of place where anyone could come in off the street and access this information. It is also not the sort of place where anyone who even worked there could access the files. Even amongst employees of a medical clinic, there is limited access. And the Supreme Court has said that in a commercial premises, there is a lesser privacy interest than in, for example, a home, but it certainly still exists. Well, let's keep going down that road. There are two things you said that we could consider. How about a third thing? The government produced evidence that its records were haphazardly held in a common area accessible by other health life employees. Well, other healthy life employees would certainly have access to them because there's other medical professionals who are working there. We don't know who these people are. We don't, but what we do know is that there are statutes that limit access to these files. And whether the clinic itself was the tidiest place or engaging in the absolutely most desirable way of maintaining patient files is a separate question from whether Dr. Crittenden had a societally recognized reasonable expectation of privacy in those files. So I guess you would argue that the commercial aspect is really just custodial, but it does change the access question for your client. Correct. This is not a situation where he left the office and essentially threw the files in the trash or left them to have anything happen. He had a continuing interest in the files themselves. He has continuing personal liability based on those files, and he has continuing obligations to maintain the privacy in those files. So I guess your position would be this is similar to if the documents were on a commercial off-site place, they wouldn't lose the medical protection or access to the records because Acme, Inc. storage has an off-site commercial, would it? Absolutely. That's an apt analogy. And, indeed, in Joe v. Broderick, whether or not that case is directly on point, the patient was certainly not at the clinic when the search took place and was there very infrequently for treatment only. So the actual geography was not what the issue turned on. Moving on to the actual false and misleading statements here. This is a situation where Dr. Cruttenden has, again, more than satisfied his burden. The overall number of either outright falsehoods or misleading information or exaggeration is really surprising. This is not like a Franks case where there's one false statement about the location of the trash can for a trash pull, where you can easily do away with something and there's an enormous additional investigation. The false statements touched every aspect of the investigation here. And as I mentioned earlier, not all facts weigh the same. And here those facts were the most important ones. This court's decision in Lull talks about the significance of the omissions or lies. I want to go back to the idea. I just want to let you know really where I'm having a problem with your argument, is this idea that the false statements and the omissions and the exaggerations touched every part of the investigation. It seems to me that even if you take out the entire undercover investigation and you take out confidential informant 1-8, are those the numbers right now, who turned out to be the same person, which is more than you have to do. What you should do is add in the stuff that calls into question the credibility. But just take it out all together. I mean, it just seems like, don't you still have all these pharmacies calling in and saying, we have these prescriptions for, was it 168 pills? I mean, when they pulled my tooth, I got two and I needed a refill if I wanted more than that. 168 pills from this place? And then they stop the people trying to pass the prescriptions and they say things like, what are you talking about? I paid $500 for this prescription. Let me get my pills. And I don't know who my doctor is. I don't remember talking to anyone. And I had to come from out of state. That's not enough for probable cause? I mean, I understand it's not enough for a conviction, but you think you couldn't get a warrant based on that, that these people are passing out prescriptions for money for 168 pills at a time to people from out of state? I have a couple different responses to that, Judge Harris. The first is that the fact that these same misstatements went, let me back up. The agents made these same misstatements to the grand jury when they got the first indictment. Then the defense filed their Franks motion and a motion to dismiss the indictment based on all these statements. And then the government went back to the grand jury to address those misstatements. That alone, to me, is a concession that the statements were material to probable cause. No, no, that's perhaps a concession that they might have affected the grand jury's thinking, but we don't ask that about, it's a different inquiry. Under Franks you say take out the bad stuff. Is there enough left for probable cause? We don't do that when information goes to a jury. We ask a different kind of question about whether it's 100% clear that the jury would not have been affected by these additional statements. It's a different question. So it is a different question, but the one informs the other. And in addition, with respect to the drug addicts who were caught red-handed in the middle of engaging in drug-seeking behavior, certainly a magistrate would consider that, but those individuals have some significant credibility problems. And it was a year and a half before, and if that was the source of the probable cause, there might be a scope issue. There's a staleness issue that comes with that. Why is there a staleness issue if you're looking for documentary evidence? I mean, I understand if you were looking to find, you know, drugs on the premises that might be stale, but you're looking for records that go back a year and a half. Why is that a problem? That's a problem because of the overall nature of the investigation, that these individuals never went back to the clinic and the clinic had, in fact, moved in between times, moved locations. But all of these, again, are factors. There's no single item to check off. And when we look at just the total tonnage of the false statements and the omissions, it's just this warrant is unlike others that come before this court on Frank's issues. But as a follow-up to Judge Harris's question, there were two other police departments, beside the federal agents that were involved in this, and the information they produced appears to be reliable. And while I got you, what about 142 patients every day on average? What does that tell you? So the clinic is busy. There's more than one medical professional working. The fact that the clinic was busy, that they don't take insurance, these are things that are not nefarious. They don't give rise to probable cause. I know in my own family I'm forever filling out out-of-network benefits to Blue Cross because half of my kids' medical providers don't take any insurance whatsoever. It's just simply not evidence of malfeasance. When you look at the importance of the different aspects of the investigation, year-old addicts engaged in drug-seeking behavior, maybe that could give rise to a hunch that something is wrong, but is it probable cause for the scope of the search that happened? No, it is not. Are you talking about the scope of the search? Is that an argument that you're raising here, that the search warrant was too broad? No, not in general. I'm just saying that if we then look at single items that might provide probable cause, then there's other potential issues that get raised. We're also in a situation where we did not have a Franks hearing at all, and the fact that so many of the misstatements and exaggerations related to credibility, it's a little hard at this preliminary stage to not know what else could be wrong. We didn't even get to have the opportunity to cross-examine the pharmacists. And we know that the agents exaggerated what the physician's assistant said. And exaggerations like that have no place in an ex parte hearing, where there's no adversarial opportunity to challenge that. Strict adherence to the truth is what is required, or else it is the unthinkable imposition upon the magistrate judge that Franks discusses. A probable cause determination also requires a totality of the circumstances. And that's, I think, what I'm trying to get at, that when you look at overall, the total weight of what is in this affidavit and what is important and what is less important, that we see that simply there's no probable cause left. So the argument really is that the misstatements and exaggerations, as you say, were so pervasive that it undermines the whole idea of truth. The whole affidavit. There's no reliability left. It's almost like saying, well, I exaggerated about 90%, but here's 10% that might look good, and believe me on that part. Exactly. Isn't that sort of the nature of the two-part Franks inquiry, that we do? I mean, the whole inquiry presupposes there will be cases where there's an outright falsity or a very misleading omission, and nevertheless, we're supposed to excise that and ask whether there's enough. We're not allowed to infer from that that the rest of it must not be true also. We're supposed to put that to one side and look at what's left. Well, I would refer to Lull in that instance, where the omission related to the confidential source stealing money during the course of a controlled buy. And the controlled buy happened. There was no question that that happened. But this court decided that the credibility information that was missing may I finish, Your Honor? Sure. Was so important that once, in fact, that the magistrate judge was not allowed to assess the credibility, that even though the truth of the actual controlled buy having happened, did not save that warrant. Also, too, part of it, I guess, here you have to weigh what kind of case it is. There are some cases where perhaps the residual, if you will, if you distill it for the truth left is so objective of nature, like you found tons of cocaine there, although there were exaggerations by witnesses, but what's left is so tangible. But here, this whole case is somewhat rather subjective because my dear colleagues were asking you a question about numbers of pills, number of patients. I guess there are any number of colonoscopies centers that run people through, you know, colon tests every day. And if you get like sheer numbers, but the question is, what's the medical significance of it? And weren't some of these people going to them saying that they were in pain? Not only saying they were in pain, but bringing documentation that they were. In fact, one of the undercover officers had been granted permanent partial disability because of an injury. And whether he was himself feeling pain at the moment, he told the doctor that he was, and he presented an MRI that showed so many problems with his back, Dr. Crittenden said, had you considered surgery on this? We can't fix this. It seemed to me an undercover case like this, if you're going to distill it for the truth of the objectivity, it would be the undercover person comes and says, hey, there's nothing wrong with me, I just need some OxyContin. Right. That's different. But if you send somebody in to say physicians ought to heal people, are they determined whether or not somebody is in pain? I mean, so when you talk about a case like this, it is different than the normal case when you have, as you say, a pervasive type of misrepresentation, as your position is, and then say, oh, but what's left? And you don't get a chance to test it against pharmacists saying this. It undermines what Franks is really about, really, the essence of it, doesn't it? It does, Your Honor. Thank you so much. Thank you. Mr. Medinger. May it please the Court, Your Honors, Jason Medinger for the United States. What about counsel? You're sending people in, telling them I'm hurting and they have real issues of pain. Aren't you really, if they're a pill mill, as the investigation was trying to determine, then you go in and say, listen, I want OxyContin. I'm not saying anything's wrong with me. Give it up. Here's my $500. Any of your people say that? Your confidentiality, was that the modus operandi of the way you, in terms of the government, handled this undercover situation? Right. So that particular scenario you mentioned, Your Honor, I don't think there's anything, at least in the affidavit, that says a patient specifically said that. Said what? That I don't have any pain, doctor, but I just want the Oxy. I know they didn't. So, you know, that's an extreme example. But I think what you have here is a search warrant where you have to sort of look at it in totality. That's what the law says. Okay. And you start a building, sort of like a building. You know, your first block is, as Judge Floyd said, 142 patients. Okay, that looks like a busy place, but let's keep talking. What's our next brick? Oh, there's people coming from out of state, Kentucky, Ohio. You mentioned a busy colonoscopy place. It might be busy, but the idea that you're traveling from Kentucky all the way out to Maryland to do this colonoscopy would be surprising. Okay. None of that is illegal, right? No. None is illegal. Okay. Keep going with your building block. Not so far. Keep going with your building block. And then we get our next brick, the idea that these patients, C.S.s. 2 through 4, have a lot of money in their pockets, cash. They have cut straws. They said, we used to go down to Florida, but Florida was shut down, so now we're going up here. Again, that's sort of another brick that says these are potentially drug-seeking individuals. Who said that they used to go to Florida? Who said that? That was in the affidavit, C.S.s. 2, 3, and 4. They went to Total Care, which was a place down in Florida, and they said to the officers, that place got shut down. That's why we're now going to Maryland. Oh, I see. These people, this is C.1, 2, 3. Okay. Yeah. And the opioid epidemic really started in Florida. Florida cracked down, and so then they went elsewhere. And Maryland was sort of ground zero while this place was in operation. So that's our third brick. Fourth, you get C.S. 6, and he's a very important witness to us. This is the individual who interviewed at this place. He's a doctor. He knows what a clinic should look like. He goes in there and sniffs around and says, this place is a pill mill. I'm not going to take employment here. Again, that's a huge brick. Then you get C.S. 9. This was an individual who went in. You have someone who said, I'm not going to work here. That's a huge brick. It is. Because I think a doctor went in there, and, you know, just like you would know if you were in a crooked legal office, a doctor knows this is a crooked doctor's office. I think you give me too much credit. I wouldn't be able to tell what a crooked office is by sniffing around their files. I may have to maybe go to trial with some of them or something like that. But go ahead. Touche, Your Honor. But I think the idea is he kicked the tires and said, this place is illegitimate. And so you put all those bricks together. And to Judge Harris's question, take out C.S. 1 and C.S. 8. That's fine. Take out the U.C. information in the affidavit. We still have all these other bricks, and we put it in our brief. We think there's 35 separate facts which show probable cause here. And that's why we think the district judge made absolutely the right decision in denying this Franks motion. So I think you have to kind of look at the constellation of activities here. And what was the purpose of denying the Franks motion? What was it about justice that would be so upended by giving one? Well, I think the district judge found on the second prong of Franks and said, I'm just going to assume they're standing. I'm going to assume that C.S. 1 is out, C.S. 8 is out. I'm going to assume that the U.C. is out. There still is this huge body of probable cause. And the magistrate, even if he took all that stuff out, the magistrate was still going to give the warrant. And I think she's right on that, because there was just this huge amount of evidence that just is not. That's supposing that the information given was correct. That's the whole idea. See, I mean, in a sense, Franks looks at all of it appears to be correct, right? I mean, those warrants. I mean, an affidavit appears to be correct. So what it's saying is that it's so much here on the other side that is admittedly some question that it calls into question all of it. Because, for example, look at the subjectivity. A physician feigning a warning, was it really did he want employment or that was a ruse too? No, no. He actually responded to an ad as if it was a legitimate job and then found out this place ain't legitimate. I see. And how did y'all find out about him? He reported to the Board of Physicians and said, I think there's something fishy here. And then the Board of Physicians got into their investigation and then they told the government. Well, isn't that a part of Franks' deceit, whether or not that's correct? Well, the burden is on the defendant to challenge that. But that burden is met. Isn't the burden met almost promulgation when you find there's significance, exaggeration, and brings in question? That gets you over the hump to say you need to look further. Or ordinarily, for example, you're right. If there's nothing else on the other side of that, then you're right. But Franks said, look, it is so suspicious that you need to look. That's what the adversarial system is about. You look at it and ex parte may not be enough. Right. So I guess I'll say, Your Honor, I actually don't think that's accurate in terms of how we need to evaluate Franks' issues. I think it's their burden to say we think CS-1 is bad, we think CS-8 is bad. We think, you know, give me a substantial showing as to what's bad, and then we can have our hearing if the balance of it is, you know, not enough. I'm not over the standing issue yet. How about tell me what your position is? So thank you, Your Honor. I think on that, and I really do think that's the basis on which this Court can and should affirm, standing we think there's six reasons why there's no standing here. First and foremost, you've got a commercial business. It means a lower expectation of privacy. Number two, this business was in a highly regulated field. Health care, DEA, the state could come in there and evaluate those files at any reasonable hour. The third fact, and this is actually very crucial, this employee left eight months before the search warrant was executed. And I'll say I've researched exhaustively to try to find a case which has an ex-employee still having standing over the search of a business. I didn't find one. And I think that goes for a very good reason. You can't still have standing in places that you left eight months ago. Fourth factor is this employee was an independent contractor. I think that's important. Fifth, this employee, as you said, Judge Floyd, expressly disavowed proprietary interest in these documents. That's Joint Appendix page 363. And if this Court were to affirm on a very narrow ground, I think that's actually the best way to do it. In other words, to say in this case, under these facts, this person said, those aren't my documents. And he said that in a contract. And if they're not his, he has no right to exclude. And if he has no right to exclude, he has no Fourth Amendment interest in them. Can I just ask you, who would have standing to challenge the search of medical records in a doctor's office? So it's a good question, Your Honor. I think the person arguably that had the most, to say the best chance, would be the owners of Healthy Life themselves. They owned the business. And under the contract, they owned the documents. But I think my argument to you would actually be to say, I don't even know if they did. And the reason I would say that is because this is a closely regulated field. Isn't that a little troubling? I mean, this is really highly personal information. If my medical file is sitting in that office, I'd like to think someone would have standing if the government fakes an undercover investigation, gets a warrant, and goes in. So it's true. But I guess what I would cite is United States v. Biswell. It's a Supreme Court case from 1972. And there it was a gun ownership, a gun shop. And they basically said, this is such a highly regulated field that government can come in and look at those business records any time they want. I think that's before people thought that gun records were really incredibly private. Well, true. But it's a Supreme Court case, which is binding here and on the books. So I cite it in this idea that I think if you get into this field, also note that in order to prescribe these opioids, these narcotics, you need a DEA license. And what Biswell really says is, if you're going to sign up for something that requires a federal DEA license, you've got to be expecting the idea that the DEA might come knocking at your door one day. I didn't sign up for the license. I'm the patient whose personal information is in those files. I didn't get a license. I just went to the doctor. And you're telling me nobody, if the government decides that they just want to take a look at those files, it's open season. There's nobody who has standing to challenge that. Well, again, maybe, I would say maybe the patient as well. You know, there was a mention of this Doe versus Broderick case. What I want to point out is that the person that sued there, John Doe, was the patient. And so this court did say, well, yes, there is some privacy interest there. But I think butting up against that is the Supreme Court's Miller case when you had the financial records, the idea that, you know, the Bank Secrecy Act says people can't get your bank account either. But the Supreme Court has said, look at standing of the account holder. You know, you're revealing that information to a third party, i.e., the bank. So you're revealing your confidential medical information to a third party, i.e., Healthy Life. Well, I didn't hear your sixth round. Before you tell me what that was, assume this skeleton wins on standing and on the denial of the Franks motion. Would it be harmless error to admit the patient files in the case? Well, I think it would be harmless error. That's an argument we've made. And the reason we made it, Your Honor, is there's just this avalanche of information that we had through the witnesses. This was a three-and-a-half-week trial, more or less. There were addicts. There were doctors. There were business owners. All of these people provided information that was separate and apart from the records. You know, one of the business owners described this scene, and it kind of gets to your question, Chief Judge Gregory, about, you know, the subjectivity of this. This business owner said, if you just looked at these people and did the surveillance, and as this business owner saw, these were the roughest, coarsest people he saw, people taking, you know, urine-filled instruments in the parking lot, snorting up in the parking lot, it was a circus. And I think the jury heard that information, and that really moved them. Certainly the patient records were discussed at trial. They were discussed by our expert. But what's interesting here, we actually had two experts, and I think that sort of helps us to your question, Judge Floyd, about the harmlessness here. One expert looked at the medical records that were seized in the search warrant. So let's take him off the board for a second. The second expert was Dr. Matsunaga, and he was a person hired by the Board of Physicians. And they did their own separate search of these records, and he looked at those records and opined at trial this didn't meet the standard of care. And based on that evidence, this court in Allaire said that's enough for the jury to convict. So I think if you look at all the things we have, patient testimony, everything that was divorced from the patient records, I think we still get there under harmless error. So what's your sixth blot? Thank you, Your Honor. So actually sixth was this idea that the records were kept in the haphazard way, and that's Joint Appendix page 358. It's a lovely picture of what these files looked like. And it was just a common file room, and they were sort of in disarray. And they were done by patient, which I think is interesting. In other words, patients would see multiple doctors. So let's say one day they see Dr. Crittenden. The next month they come back, they see Dr. Alexander, things of that nature. But they're kept by patient, which is just kind of how any doctor's office would work. So why that's important goes to our standing issue, this idea that these weren't Dr. Crittenden's personal files. It wasn't like he kept all of his patients in one area. They were just sort of all mixed up all together. And so when you're going in and doing a search, you're going to search for the patients, and they're going to understandably have Dr. Crittenden's files in there. I think the case that comes the closest to sort of our scenario, and, again, I think Ms. Skelton's right, this Court hasn't dealt with this specific issue, i.e., ex-employee, doctor's office, patient files. I don't think there's a case in this circuit that deals with that. But the two that I would commend to the panel's consideration is, one, United States v. Torch. That's a commercial business case. That's one that Fourth Circuit, 1979, a little dated, but in the sense that that employee didn't have Fourth Amendment standing and it was a current employee. The search was at a warehouse. It's cited in Horowitz, which is another case we cited. The other one is this Williams v. Coons case. It's out of the Fifth Circuit. It's 1986, and they said expressly, to your point about the haphazard files, there's no reasonable expectation of privacy in a corporate records maintained in a common file room. And I think that makes sense. Everybody could go in there and look at information, and, you know, I think the other thing about standing that we need to talk about is to show that first prong under cats. It was Dr. Crittenden's burden to show that he was doing something subjective to hide these documents from view. In other words, you know, putting a lock on something, putting them in his desk, saying do not touch my files. He didn't make that showing here. They offered no evidence at our motions hearing, and, of course, he couldn't because he was gone. He had left that place eight months ago. So there was nothing that he was doing subjectively to say don't look at these documents, and I think that's important to show that he can't show standing here. A couple other facts that I do want to talk about. My colleague, Ms. Skelton, talked about the source of their belief of standing, and she indicated that she believed it was HIPAA and the AMA ethics standards. In my view, that is bootstrapping the privacy rights of another person onto Dr. Crittenden, and I don't think under Fourth Amendment jurisprudence we can do that. In other words, Fourth Amendment says it's personal rights. If you look at the text of the Fourth Amendment itself, it says they have a privacy interest in their persons, their houses, their papers, their effects, and that word, T-H-E-I-R, there, is important here. So I don't think he can assert under HIPAA any sort of privacy right because it ain't his privacy. Well, when a physician sees a patient and she makes notes about the clinical findings, the diagnosis, the treatment plan, as well as the prognosis, that's not her effects in her professional endeavor? That's not her effects? Right. So I'm glad you asked that question, Your Honor. Thank you. And I think the answer is no. Why not? So if you look at what this Court said in Horowitz, that issue, this idea of, well, it's my work product, and therefore I have a Fourth Amendment interest in it, this Court rejected that notion and said, yeah, maybe you created it, but after you created it, it was then sent to another area over which you're not exercising exclusive rights. The other case that looked directly, I believe, at that issue … But she would be. It's not that after the physician finished with that process I just talked about in the hypothetical, she didn't just say, I'm throwing this to the Hustons and, you know, it's available for anybody who wants to see it. It's in a pamphlet. It's in a physician's office. It doesn't make any difference to me that the non-physicians who own it, they're still there facilitating a physician's office. So how has she lost the control or access to the effects because of that? I think the answer is you've got to do something subjectively to continue to ensure that those are being safeguarded. Whether it's putting a lock on it or, you know, putting it behind a closed door, you've got to do something. Would it have been enough if she'd put in her hypothetical and her agreement with her employer, I actually do have a possessory interest in my work product? So that would change dramatically. I really do think that would change things very differently because certainly then we would have that proprietary interest. And this court has found proprietary rights by themselves aren't sufficient, but they're certainly one factor that looms very importantly. So I think if he had said, yeah, these are mine, I think the analysis on standing would be a much closer question. So nine months later not being there would have nothing to do with whether or not at the time he said this is mine. Do you agree with that? Well, I actually still think that would be a separate issue why we would win because nine months have gone. In other words, my argument would be. See, that's why you would win. Maybe you would prevail in an appropriate Frank's hearing. The question is you never had a chance to have one. You may be right. We don't know. So you could boast to the prospect or the projection that you would have. That's why we left just to your boast and not any test of truth because we didn't have one. So the question is on the other side of your, you know, sort of somewhat belief that you would have won. The question is here. This is a physician. We're not talking about somebody making widgets and putting them on the shelf and you come in and say, I want to see all the widgets you made. It's one of the, you know, the three great professions, you know, some law, medicine, and, you know, that kind of thing, and the clergy. They're very private. They're very personal. And I still think the answer to Judge Harris' question is that even patients wouldn't have standing in your scenario. No one does. The government could come in any time they want. I'm going in. I'm getting all of the medical records because you have no standing. No one does. That's really the position and the logical extent of the argument, isn't it? So in fairness, Your Honor, I think it is, and I guess here's my retort on that. Yes. My retort is we actually want that to be the case. Who are we, the people of the United States, the government, this democracy, or the Constitution, or the police officers? Who are we? Who are we, counsel? I'd say collectively the persons of the United States. And here's my argument, Your Honor. I'd say this because. I vote no. Okay. Well, and fair enough, but I think, you know, the government has a role to police bad doctors, and we want bad doctors to get out of the system. And you want your government to find pill mill people that are giving opioids at this level and ruining lives. And I think that's why I answer the way I do, Your Honor. I mean, I understand these privacy interests, and we understand what Doe said. But that's assuming that the government will only use this kind of hypothetical awesome power to look at everybody's health records in the country for any reason, will only use it for good, right? I mean, don't I have a right to be concerned that, I don't know, there's always the prospect, right, that somebody, there's been a lot of discussion recently from the White House about the health status of certain justices. What if they just want to take a look? Maybe someone wants to just actually look at Justice Sotomayor's records and see how things are going for her. You're saying they could go in and get them, and there's nothing anyone could do. Well, there certainly is. I mean, I think that the magistrate judge process, I mean, that's why we have search warrants. I mean, we don't have unfettered power. We have to have a neutral, independent judicial authority to say, yeah, you've got probable cause that there's a crime here. But if it goes wrong, there's no check. No one has standing to challenge the search. And what if they go in without a warrant? Who's going to have standing then? Well, I mean, I think if they go in without a warrant, then we have a… How would that change the standing inquiry? Either way, your view is it's just a medical record, nothing to see here. Right. So I think it would be a closer question on standing. Why would it be a closer question if there's not a warrant? I don't understand that. Well, I think perhaps Doe says that there is some privacy right in the patient. So, again, and your justice… But that would be true if there were a warrant also. I don't understand why getting a warrant changes the privacy interests. Well, I think getting the warrant, again, puts it through this neutral, detached magistrate process. That doesn't have anything to do with who has a privacy interest. I understand that that's a… It makes my concern about unbridled discretion. It addresses my sort of policy concern, but if there's a… Maybe I'm just misunderstanding. I understand the policy implications, but I don't understand why whether or not someone has Fourth Amendment standing is affected by whether there's a warrant. Either way, as you said, the whole question is, do you have a privacy interest that is personal to you in what happened in this search and the results of this search? I don't remember anything about a warrant in that inquiry. Right. And I see your point, Your Honor. I mean, standing is… It sort of gets you in the door. So… So we can't assume, as long as we're just unspooling my crazy parade of horribles, let's not assume there's a warrant. Let's assume there's not. Yes. And, Chief Judge, I'm past my time. Is it okay if we continue? Absolutely. You can answer Judge Harris' question. Thank you, Your Honor. All right. So I think the answer to your question, if I'm sort of giving it thought, I mean, I think based on our facts and case law, I do think the standing issue is going to be something that I frankly don't know if we're going to have standing with an individual in those circumstances. As troubling as that might be, I think the idea is we have a government that's been given powers to investigate, and that's, I think, the answer. Would the DEA have the right, under its licensing power, to go into that clinic and check the prescription record with or without a warrant? So we do have administrative subpoena powers. We also have, under 21 U.S.C. 880, and there's also a CFR site, in our view, the idea to go in at any reasonable time. So in our view, as long as they show their credentials and say we're DEA agents, we're here to look at narcotics distributions, I think they have the right to go into that clinic and look at those files. That's their beat. But to be clear on all this, we're not talking about an individual patient here. We're talking about an ex-employee who wasn't there for eight months. It wasn't his information. It was the patient's. And we do respectfully submit that there's no standing here. And, again, if we just decided on the contract alone, I think that's enough. I think we win just right there. Thank you, Counsel. Thank you, Your Honors. All right. Ms. Skelton, you have a few minutes reserved. Thank you, Your Honor. I'd like to talk about harmless error for a moment, and also for standing, if I have time after that. First of all, the government talks about an avalanche of other information. I'd like to say that how did the government get the individual patients to testify at trial from the patient records? The patients themselves are fruit of the illegal search. So they would be excluded. They talk about two experts testifying. Well, what we have here is a constitutional error, and, of course, the government's burden is to prove that there's no reasonable possibility that the patient files had any impact on the jury. And there's no way they could do that here. The experts didn't just discuss the files. These files were actually admitted into evidence. And, like I said, the patients themselves who testified were fruit. The government talked about the other business owners coming to testify about a circus atmosphere. Well, those people had nothing to say about Dr. Crittenden. They had something to say about the clinic, but nothing about Dr. Crittenden and his interaction with the patients. So there's simply no way the government can meet its burden of harmless error here. The government has such an extreme position on standing that it simply cannot be the law. And I think Chief Judge Gregory, you're right that the medical profession is different. A priest-penitent privilege lasts until death. A doctor-patient privilege lasts until death. I have clients who have finished serving their sentences and are off supervised release, and I cannot discuss what happened with them, and my files are not open to perusal. The way that files are stored and the fact that others had access to them, I'm not the first lawyer on this case. Dr. Crittenden had two other lawyers in my office who were his trial counsel. They still can prevent people from looking at my files. The fact that other professionals had access to the files simply doesn't defeat standing. It is true that Dr. Crittenden cannot assert someone else's privacy rights to protect under the Fourth Amendment, but the fact that the doctor-patient relationship is so different puts that kind of old saw of Fourth Amendment law in a different light. I mentioned before that the patient's privacy interest is meaningless if other people cannot come in and assert that right, and the physician. It seems to me there are two different theories. I just want to understand which one you're relying on. There's one that would sort of go, unless the doctor can kind of third-party assert the patient's privacy interest, that is a privacy interest that will go unprotected entirely, and then there's another one that Chief Judge Gregory was alluding to, which is forget the patient. This is doctor work product. The doctor has his or her own independent privacy interest in the records. Are you making both of those arguments, one of them? What exactly? I am not choosing between these two. I think that under the totality of the circumstances, all of these things are relevant. I think the federal laws that prohibit anyone from exposing this information are relevant. I think the fact that Dr. Crittenden has professional liability exposure based on the content of those files is relevant to himself. That is not asserting third parties' right. I think that the need to protect the patient puts a medical file in a totally different category from a corporate record. So I'm not choosing between these. These are all factors that are relevant, and it is part of the kind of mushy concept of totality of the circumstances that comes into Fourth Amendment discussions. The patient might be protected even without the doctor, right? If notwithstanding, I understand the government isn't conceding this, but if I thought that the owner of the business of a clinic, of a medical office, obviously has standing to challenge an entry into that business, that would take care of the patient, right? It could. But the fact that somebody else also has standing does not defeat Dr. Crittenden. If the Court has no further questions. Thank you, Counsel. We'll come down and greet Counsel and proceed to our next case.
judges: Roger L. Gregory, Henry F. Floyd, Pamela A. Harris